# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FIDELITY NATIONAL TITLE
INSURANCE COMPANY, in its
individual capacity and as subrogee of : CIVIL ACTION
JP MORGAN BANK, N.A., successor to
WASHINGTON MUTUAL BANK, F.A.,

    Plaintiff,

    v.

VINCENT E. CRAVEN, Jr., et. al., : NO. 12-4306

    Defendants.

## MEMORANDUM

BUCKWALTER, S.J.                                                                                                    July 17, 2013

Currently pending before the Court are Defendants Vincent E. Craven, Aimee F. Craven, and Valerie A. Craven's (collectively "the Cravens") Motion to Dismiss Plaintiff Fidelity National Title Insurance Company's ("Fidelity") Amended Complaint and Defendant Tammi M. Torbik's Motion to Dismiss Fidelity's Amended Complaint. For the following reasons, the Motions are granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This suit arises out of an alleged conspiracy to defraud Plaintiff Fidelity and other lenders by taking out mortgages and failing to record them properly so that they went unpaid at foreclosure. The facts of the case, as set forth in the Amended Complaint, focus on Defendants' actions in the mortgaging and sales of three properties.

### A. 328 Fifth Avenue, Conshohocken, PA

On or about January 15, 2003, Valerie Craven conveyed the real property located at 328 Fifth Avenue, Conshohocken, PA ("The Conshohocken Property") to Vincent Craven, her father, via deed. (Am. Compl. ¶ 10.) The deed was properly recorded with the Office of the Recorder of Deeds of Montgomery County. (Id.) On or about March 4, 2005, Mr. Craven executed and delivered two mortgages against the Conshohocken Property. (Id. ¶ 11.) The first was an open-end mortgage in favor of Wachovia Bank, FSB ("Wachovia") in the amount of $105,000.00. (Id.) This mortgage was recorded on March 24, 2005. (Id.) Secondly, also on March 4, 2005, Mr. Craven executed a mortgage in favor of Washington Mutual Bank, F.A. ("Washington Mutual") in the amount of $213,750.00. (Id.) This mortgage was recorded on April 14, 2005. (Id.)

After these mortgages were taken out, Whitford Land Transfer, Inc. ("Whitford"), an authorized title agent of Fidelity, issued a Loan Policy of Title Insurance ("The March 2005 Loan Policy") to Washington Mutual, insuring that its mortgage was a first position mortgage lien against the Conshohocken Property. (Id. ¶ 12.) Defendant Torbik, in her capacity as a closing agent for Whitford, processed the March 2005 Loan Policy. (Id. ¶ 13.) Neither Mr. Craven nor Ms. Torbik disclosed to Fidelity that the Wachovia mortgage and the Washington Mutual mortgage were executed on the same day. (Id. ¶¶ 14, 17.) Ms. Torbik intentionally recorded the Wachovia mortgage ahead of the Washington Mutual Mortgage. (Id. ¶ 18.) Ms. Torbik also failed to ensure that a Seller Affidavit or Owner Affidavit were executed, which would have included a statement that the properties were free of liens or encumbrances known to the seller. (Id. ¶¶ 15–16.) Because the Wachovia mortgage was recorded ahead of the Washington Mutual

mortgage, the Washington Mutual mortgage was not a first position mortgage lien. (Id. ¶ 19.) As a result, Washington Mutual tendered a claim under the March 2005 Loan Policy. (Id. ¶ 20.)

On or about October 11, 2005, Mr. Craven conveyed the Conshohocken property to his wife, Aimee Craven, under a deed dated September 23, 2005. (Id. ¶ 21.) This deed was recorded on November 20, 2006. (Id.) In conjunction with this sale, on or about October 11, Aimee Craven executed a purchase money mortgage against the Conshohocken Property in favor of Washington Mutual for $312,000.00. (Id. ¶ 24.) This mortgage was recorded on October 5, 2006. (Id.) Ms. Torbik also processed this transaction wherein Aimee Craven "purchased" and mortgaged the Conshohocken Property from her husband. (Id. ¶ 25.) After doing so, Ms. Torbik issued a check payable to Washington Mutual for an amount sufficient to satisfy the debt from the March 2005 Washington Mutual mortgage. (Id. ¶ 26.) However, instead of delivering the check to Washington Mutual, Ms. Torbik delivered it to Mr. Craven with the knowledge and intent that he would not deliver it to Washington Mutual. (Id. ¶¶ 28–29.) Mr. Craven then fraudulently negotiated the check and deposited the funds to a bank account owned by his own company, Monument Mortgage. (Id. ¶ 30.) As a result of these actions, neither the Wachovia nor the Washington Mutual March 2005 mortgage was paid off. (Id. ¶ 31–32.) Both Ms. Torbik and Aimee Craven were aware of these mortgages at the time of the sale from Mr. Craven to Aimee. (Id. ¶ 33–34.)

In connection with the October 2005 sale from Mr. Craven to his wife, Aimee, and the corresponding purchase money mortgage, Ms. Torbik and Whitford issued another Loan Policy of Title Insurance, which insured the purchase money mortgage as a first position mortgage lien against the Conshohocken Property. (Id. ¶ 35.) However, despite committing Fidelity (via its

3

agent, Whitford) to insure the October 2005 purchase money mortgage as a first position mortgage lien, Ms. Torbik recorded this mortgage as a *third* position mortgage lien behind the original Wachovia and Washington Mutual mortgages. (Id. ¶ 36.)

Aimee Craven eventually defaulted on the loan secured by the 2005 purchase money mortgage. (Id. ¶ 37.) While preparing to initiate foreclosure, Washington Mutual obtained a title report indicating that both the Wachovia and original Washington Mutual mortgages remained of record. (Id. ¶ 38.) Mr. Craven defaulted on both of these mortgages. (Id. ¶ 39.) As a result of Mr. Craven's default on its loan, Wachovia secured a judgment in mortgage foreclosure against Mr. Craven and scheduled a Sheriff's sale of the property for June 23, 2010. (Id. ¶ 40.) In order to avoid a divestiture of both the March 2005 insured mortgage and the October 2005 insured mortgage, Fidelity paid off Mr. Craven's loan secured by the Wachovia mortgage. (Id. ¶ 41.)

JPMorgan Chase Bank, N.A. ("Chase"), through the acquisition of certain assets of Washington Mutual, is now the holder of the March 2005 and October 2005 insured mortgages. (Id. ¶ 42.) Pursuant to its obligations under the October 2005 loan policy, Fidelity is tendering payments to Chase in satisfaction of the March 2005 mortgage. (Id. ¶ 43.)

**B.     922 Montgomery Avenue, Unit C-5, Bryn Mawr, PA**

On or about March 9, 2004, Valerie Craven conveyed the real property at 922 Montgomery Avenue, Unit C-5, Bryn Mawr, PA ("The Bryn Mawr C-5 Property") to her father, Mr. Craven, under a deed which was never recorded. (Id. ¶ 44.) Also on or about March 9, 2004, Mr. Craven executed a mortgage against the Bryn Mawr C-5 Property in favor of Washington Mutual for $140,000.00. (Id. ¶ 45.) On behalf of Fidelity, Whitford and Ms. Torbik issued a loan policy insuring this mortgage as a first position mortgage lien against the property. (Id. ¶ 46.)

4

Ms. Torbik, however, failed to record the mortgage. (Id. ¶ 47.)

On or about September 23, 2005, Mr. Craven sold the Bryn Mawr C-5 Property to his wife, Aimee, under a deed that was recorded on April 18, 2006. (Id. ¶ 49.) At this time, the insured C-5 mortgage was not paid off. (Id.) Subsequently, on July 24, 2006, Aimee Craven conveyed the Bryn Mawr C-5 Property to Vincent Varvolis, under a deed recorded on March 15, 2007. (Id. ¶ 50.) Mr. Varvolis also executed a mortgage against the property in the amount of $180,000.00, which was recorded on March 15, 2007. (Id. ¶ 52.) The original insured C-5 mortgage executed by Mr. Craven was still not paid off. (Id. ¶ 51.)

Because neither the original insured C-5 mortgage nor the deed conveying the house from Valerie Craven to Vincent Craven was ever recorded, the insured C-5 mortgage was never perfected as a lien. (Id. ¶ 47.) Moreover, the insured C-5 mortgage did not attach to the property when it was conveyed from Mr. Craven to Mr. Varvolis. (Id. ¶ 54.) As a result, Plaintiff Fidelity paid Chase (the successor to Washington Mutual) for the insured C-5 mortgage. (Id. ¶ 55.)

### C.     922 Montgomery Avenue, Unit E-5, Bryn Mawr, PA

The facts for the real property at 922 Montgomery Avenue, Unit C-5, Bryn Mawr, PA ("The Bryn Mawr E-5 Property") are almost identical to those for the Bryn Mawr C-5 Property. On or about March 9, 2004, Valerie Craven conveyed the Bryn Mawr E-5 Property to her father, Mr. Craven, under a deed which was never recorded. (Id. ¶ 56.) Also on or about March 9, 2004, Mr. Craven executed a mortgage against the Brywn Mawr E-5 Property in favor of Washington Mutual for $138,000.00. (Id. ¶ 57.) On behalf of Fidelity, Whitford and Ms. Torbik issued a loan policy insuring this mortgage as a first position mortgage lien against the property. (Id. ¶ 58.) Ms. Torbik, however, failed to record the mortgage. (Id. ¶ 59.)

5

On or about July 19, 2006, Aimee Craven conveyed the Bryn Mawr E-5 Property to Mr. Varvolis, under a deed recorded on March 15, 2007. (Id. ¶ 61.) Mr. Varvolis also executed a mortgage against the property in the amount of $180,000.00, which was recorded on March 20, 2007. (Id. ¶ 63.) The original insured E-5 mortgage executed by Mr. Craven was still not paid off. (Id. ¶ 62.)

Because neither the original insured E-5 mortgage nor the deed conveying the house from Valerie Craven to Vincent Craven was ever recorded, the insured E-5 mortgage was never perfected as a lien. (Id. at ¶ 64.) Moreover, the insured E-5 mortgage did not attach to the property when it was conveyed to Mr. Varvolis. (Id. ¶ 65.) As a result, Plaintiff Fidelity paid Chase (the successor to Washington Mutual) for the insured E-5 mortgage. (Id. ¶¶ 66–67.)

### D. Procedural History

Plaintiff Fidelity brought suit on July 30, 2012, alleging ten counts, including (1) fraud against Vincent Craven, Aimee Craven, and Monument Mortgage for failing to disclose to Fidelity the existence of the Wachovia mortgage and the numerous transfers and sales of the properties in question; (2) fraud against Vincent Craven, Aimee Craven, and Valerie Craven for directing Tammi Torbik to not record the various mortgages and for failing to inform Fidelity that the instruments were never recorded; (3) fraud against Tammi Torbik for failing to disclose the above information and for directing the Washington Mutual payoff check for the 2005 Conshohocken property mortgage to Mr. Craven; (4) negligence against Tammi Torbik; (5) breach of fiduciary duty against Tammiy Torbik; (6) breach of contract against Vincent Craven and Aimee Craven; (7) unjust enrichment against Vincent Craven, Aimee Craven, Valerie Craven, and Monument Mortgage; (8) conversion against Vincent Craven, Aimee Craven, Valerie Craven,

and Monument Mortgage; (9) civil conspiracy against Vincent Craven, Aimee Craven, Valerie Craven, and Tammi Torbik; and (10) violations of the Racketeer Influence and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962 et. seq. After Motions by both Defendants, the Court dismissed Counts I–III, IX, and X without prejudice and Counts VI, VII, and VIII with prejudice.

On December 12, 2012, Fidelity filed an Amended Complaint and, with new facts, reasserted Counts I–III, IX, and X. Defendants Vincent, Valerie, and Aimee Craven filed a Motion to Dismiss Counts I, II, IX, and X on December 31, 2012. Fidelity filed a Response in Opposition on January 14, 2013, and the Cravens filed a Reply Brief on January 16. Defendant Tammi Torbik filed her own Motion to Dismiss Claims III, IX, and X on December 26, 2012. Fidelity filed a Response in Opposition on January 9, 2013, and Ms. Torbik filed a Reply Brief on January 16. The Court will now consider the merits of these Motions.

## II.     STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P.12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. Following these basic dictates, the Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), subsequently defined a two-pronged approach to a court's review of a motion to dismiss. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal

7

conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. Thus, although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678–79. Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679. "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232–34 (3d Cir. 2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual allegations must be enough to raise a right to relief above the speculative level'") (quoting Twombly, 550 U.S. at 555)).

Notwithstanding these new dictates, the basic tenets of the Rule 12(b)(6) standard of review have remained static. Spence v. Brownsville Area Sch. Dist., No. Civ.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008). The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. Phillips, 515 F.3d at 233. Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

**III.     DISCUSSION**

    **A.     Fidelity's Claims for Fraud (Counts I–III)**

Rule 9(b) of the Federal Rules of Civil Procedure provides that, when alleging a cause of action based on fraud, "a party must state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b) (emphasis added). Rule 9(b) applies with equal force to both fraud actions under federal statutes and actions that are based on state law but brought in federal court. See Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007); Christidis v. First Pa. Mortg. Trust, 717 F.2d 96, 99 (3d Cir. 1983). Under Pennsylvania law, the six elements of a common law fraud action are: (1) a misrepresentation; (2) material to the transaction; (3) made falsely; (4) with the intent of misleading another to rely on it; (5) justifiable reliance resulted; and (6) injury was proximately caused by reliance.[1] Santana Prods., Inc. v. Bobrick Washroom Equip., Inc., 401 F.3d 123, 136 (3d Cir. 2005) (citing Viguers v. Philip Morris USA, Inc., 837 A.2d 534 (Pa. Super. Ct. 2003)). "In real estate transactions, fraud arises where a seller knowingly makes a misrepresentation, undertakes a concealment calculated to deceive, or commits non-privileged failure to disclose." Sewak v. Lockhart, 699 A.2d 755, 759 (Pa. Super. Ct. 1997) (citing De Joseph v. Zambelli, 139 A.2d 644, 647 (Pa. 1958)). In order to survive a motion to dismiss, the plaintiff's complaint must "plead or allege the date, time and place of the alleged fraud[,] or otherwise inject precision or some measure of substantiation into a fraud allegation." Frederico, 507 F.3d at 200 (citing Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir. 2004)).

---

[1]The Cravens cite to the lack of privity between Plaintiff and Defendants as evidence that the pleading is inadequate. However, there is no requirement for privity for a fraud claim under Pennsylvania law.

The Court previously dismissed Fidelity's fraud claims in its first Complaint as failing to meet the heightened pleading standard required by Rule 9(b). Both the Cravens and Ms. Torbik claim that Fidelity has again failed to allege with the requisite particularity the facts necessary to give precision and substantiate the allegations of fraud. The Court finds, however, that, though imperfect, Fidelity has added enough to their Amended Complaint to allow it to proceed. In addition to the original allegations that Defendants failed to disclose the existence of the unsatisfied mortgages for Wachovia and Washington Mutual and failed to inform Fidelity that the deeds and mortgages for the properties at issue were not recorded, Fidelity has added an allegation that the Cravens failed to execute Sellers or Owners affidavits. (Am. Compl. ¶ 15.) Moreover, and more importantly, Fidelity attached a copy of the check that was made out to Washington Mutual and fraudulently negotiated and deposited into an account owned by Vincent Craven's company, Monument Mortgage. The addition to the Amended Complaint of the copy of this check adds detail and substantiation to the allegations such that the Cravens are on notice of the allegations and can appropriately respond.[2]

Similarly, Fidelity's allegations against Ms. Torbik now meet the heightened standard of Rule 9(b). Again, the addition of the check alleged to have been fraudulently delivered to Vincent Craven by Ms. Torbik adds particularity that was missing in the original Complaint. Ms. Torbik

---

[2]The Cravens argue that the fraud claim (and all claims) should be dismissed under the "Corporate Conspiracy Doctrine." Though they do not cite to any caselaw, it appears they are referring to the "Intra-Corporate Conspiracy Doctrine," which under Pennsylvania law holds that "a corporation's employees, acting as agents of the corporation, are deemed incapable of conspiring among themselves or with the corporation." Am. Bd. of Internal Med. v. Von Muller, No. Civ.A.10-2680,2011 WL 857337, at *12 (E.D. Pa. Mar. 10, 2011). As Ms. Torbik is accused of conspiring with the Cravens, who are not employees or agents of Fidelity, the doctrine is inapplicable to this case.

is in a position to adequately respond to the claim of fraud against her.

Ms. Torbik also argues that the fraud claim should be dismissed with prejudice due to the economic loss doctrine. Pennsylvania's economic loss doctrine "'provides that no cause of action exists for negligence that results solely in economic damages unaccompanied by physical or property damage.'" Azur v. Chase Bank, USA, 601 F.3d 212, 222 (3d Cir. 2010) (citing Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 175 (3d Cir. 2008) (other citations omitted). Ms. Torbik cites to Werwinski v. Ford Motor Co., 286 F.3d 661 (3rd Cir.2002) for the proposition that the economic loss doctrine bars intentional fraudulent behavior from misrepresentations arising out of a contractual relationship. Werwinski, however, was done in the context of a products liability case wherein defendant's liability was covered under the product's warranty and would be the same under either a contractual or tort theory. We decline to extend Werwinski's holding to the facts of the current case. See also Foster v. Nw. Mut. Life, No. Civ.A.02-2211, 2002 WL 31991114, at *2 (E.D. Pa. Jul. 26, 2002) (refusing to extend Werwinski from the products liability context).

Defendants' Motions to Dismiss Plaintiff's claims on fraud (Counts I–III) are therefore denied.

### B. Fidelity's Claim for Civil Conspiracy Against All Defendants

"The essential elements of a claim for civil conspiracy are: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and, (3) actual legal damage . . . . Proof of malice, or an intent to injure, is also an essential part of a cause of action for conspiracy." Commonwealth v. TAP Pharm. Prods., Inc., 36

A.3d 1112, 1144 (Pa. Commw. Ct. 2011). Malice requires proof that the conspirators took unlawful actions with the specific intent to injure the plaintiff, instead of simply furthering their own interests through unlawful means. See id. at 1185 (collecting cases).

When dismissing Fidelity's conspiracy charge from its original Complaint, the Court noted that Fidelity failed to adequately plead malice or to show what overt acts were taken in furtherance of the conspiracy. Fidelity has fixed these pleading deficiencies in its Amended Complaint. Specifically, Fidelity cites nine overt acts in paragraph 161 of the Amended Complaint and alleges malice in paragraph 162. As a result, the Cravens and Ms. Torbik's Motions are denied as to the conspiracy claim.

**C.    Fidelity's RICO Claim Against All Defendants**

A claim for civil RICO under 18 U.S.C. § 1962(C) requires a plaintiff to plead four elements: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 362–363 (3d Cir. 2010). The Cravens and Ms. Torbik claim that Fidelity has failed to properly allege an enterprise or a pattern of racketeering activity. The Court previously dismissed Fidelity's RICO Claim as filed in its original Complaint for failing to adequately allege an enterprise. Because the Amended Complaint does not fix this error, the RICO claim is again dismissed

Section 1961(4) defines enterprise as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The statute describes two categories of enterprises: "[t]he first encompasses organizations such as corporations and partnerships, and other 'legal entities.' The second covers 'any union or group of individuals associated in fact although not a legal entity.'" United States v.

12

Turkette, 452 U.S. 576, 581–82 (1981) (quoting 18 U.S.C. § 1961(4)). Whereas associations from the first category are relatively straightforward, those in the second category prove to be more difficult. For an association-in-fact enterprise, there must be "'some sort of structure . . . within the group for the making of decisions, whether it be hierarchical or consensual. There must be some mechanism for controlling and directing the affairs of the group on an on-going, rather than ad hoc, basis.'" In re Ins. Brokerage Antitrust Litig., 618 F.3d at 365 (quoting Turkette, 452 U.S. at 222). Second, the associates must function as a continuing unit. Id. at 365. Finally, the association-in-fact be "an entity separate and apart from the pattern of activity in which it engages." Id. (quoting Turkette, 452 U.S. at 583). On this last requirement:

> [It] is not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity, but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses. The function of overseeing and coordinating the commission of several different predicate offenses and other activities on an on-going basis is adequate to satisfy the separate existence requirement.

Id. (quoting United States v. Riccobene, 709 F.2d 214, 223–24 (3d Cir. 1983)).

Fidelity claims that an association-in-fact exists wherein the Cravens and Ms. Torbik each play a part in conducting a scheme of fraudulent activity as to the three properties at issue. Fidelity alleges that the group has a structure because Mr. Craven "controlled" the enterprise. (Am. Compl. ¶ 168(a).) Fidelity argues that the purpose of the enterprise was to commit bank fraud upon Washington Mutual, for whom Fidelity sues as subrogee. (Am. Compl. ¶ 170.) However, the Amended Complaint still does not allege facts suggesting that the supposed enterprise is an entity separate and apart from the alleged pattern of racketeering. There is nothing in the Amended Complaint to suggest that the four of these individuals had any function wholly

13

unrelated to the fraudulent activity claimed in this case. The only interaction with Torbik, in fact, came as a result of the alleged fraudulent activity. As such, Fidelity cannot meet the standard for a RICO claim and Defendants' Motion is granted as to this claim.

## IV. CONCLUSION

In light of the foregoing, the Court denies the Motions of both sets of Defendants on the Fraud claims (Counts I–III), as Fidelity's Amended Complaint adds enough to meet the heightened pleading standard of Rule 9(b) for fraud. Similarly, the Motions are denied as to the Conspiracy claim (Count IX), as Fidelity has rectified its original deficiencies by citing the overt acts taken in furtherance of the conspiracy and by alleging malice. Finally, the Motions are granted as to the RICO claim, as Fidelity has not alleged an enterprise.

An appropriate Order follows.