## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FIDELITY NATIONAL TITLE | : | |
| INSURANCE COMPANY, in its | : | |
| individual capacity and as subrogee of | : | CIVIL ACTION |
| JP MORGAN BANK, N.A., successor to | : | |
| WASHINGTON MUTUAL BANK, F.A., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| VINCENT E. CRAVEN, Jr., et. al., | : | NO.  12-4306 |
| | : | |
| Defendants. | : | |

### MEMORANDUM

BUCKWALTER, S.J.                                                                              January 19, 2016

Currently pending before the Court is the Renewed Motion by Third-Party Defendants

Bruce G. Taylor and Whitford Land Transfer Co., Inc. (collectively, "Third-Party Defendants")

for Summary Judgment as to the Third-Party Complaint filed by Defendant Tammi M. Torbik

("Torbik").  For the following reasons, the Motion is granted in its entirety.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

This suit arises out of an alleged conspiracy to defraud Plaintiff Fidelity National Title

Insurance Company ("Fidelity") and other lenders by taking out mortgages and failing to record

them properly so that they went unpaid at foreclosure.  According to the Amended Complaint in

this matter, Defendant Tammi M. Torbik allegedly took an active part in three fraudulent

schemes.  Torbik, in turn, filed a Third-Party Complaint alleging that her former employer,

Whitford Land Transfer Co., Inc. and its principal, Bruce G. Taylor, should have defended and indemnified her.

### A.      The Underlying Litigation

The facts of the case, as set forth in the Amended Complaint, focus on Defendants' actions in the mortgaging and sales of three properties.

### 1.      328 Fifth Avenue, Conshohocken, PA

On January 15, 2003, Valerie Craven conveyed the real property located at 328 Fifth Avenue, Conshohocken, PA ("The Conshohocken Property") to her father Vincent Craven via deed.  (Am. Compl. ¶ 10.)  The deed was properly recorded with the Office of the Recorder of Deeds of Montgomery County.  (Id.)  On or about March 4, 2005, Mr. Craven executed and delivered two mortgages against the Conshohocken Property.  (Id. ¶ 11.)  The first was an open-end mortgage in favor of Wachovia Bank, FSB ("Wachovia") in the amount of $105,000.00. (Id.)  This mortgage was recorded on March 24, 2005.  (Id.)  The second was a mortgage executed by Mr. Craven, also on March 4, 2005, in favor of Washington Mutual Bank, F.A. ("Washington Mutual") in the amount of $213,750.00.  (Id.)  This mortgage was recorded on April 14, 2005.  (Id.)

After these mortgages were taken out, Whitford Land Transfer, Inc. ("Whitford Land"), an authorized title agent of Fidelity, issued a Loan Policy of Title Insurance ("The March 2005 Loan Policy") to Washington Mutual, insuring that its mortgage was a first position mortgage lien against the Conshohocken Property.  (Id. ¶ 12.)  Defendant Torbik, in her capacity as a closing agent for Whitford Land, processed the March 2005 Loan Policy.  (Id. ¶ 13.)  Neither Mr. Craven nor Ms. Torbik disclosed to Fidelity that the Wachovia mortgage and the Washington

2

Mutual mortgage were executed on the same day.  (Id. ¶¶ 14, 17.)  Ms. Torbik recorded the Wachovia mortgage ahead of the Washington Mutual Mortgage.  (Id. ¶ 18.)  Ms. Torbik also failed to ensure that a Seller Affidavit or Owner Affidavit were executed, which would have included a statement that the properties were free of liens or encumbrances known to the seller.  (Id. ¶¶ 15–16.)  Because the Wachovia mortgage was recorded ahead of the Washington Mutual mortgage, the Washington Mutual mortgage was not a first position mortgage lien.  (Id. ¶ 19.)  As a result, Washington Mutual tendered a claim under the March 2005 Loan Policy.  (Id. ¶ 20.)

On October 11, 2005, Mr. Craven conveyed the Conshohocken property to his wife, Aimee Craven, under a deed dated September 23, 2005.  (Id. ¶ 21.)  This deed was recorded on November 20, 2006.  (Id.)  In conjunction with this sale, Aimee Craven executed a purchase money mortgage against the Conshohocken Property in favor of Washington Mutual for $312,000.00.  (Id. ¶ 24.)  This mortgage was recorded on October 5, 2006.  (Id.)  Ms. Torbik also processed this transaction wherein Aimee Craven "purchased" and mortgaged the Conshohocken Property from her husband.  (Id. ¶ 25.)  After doing so, Ms. Torbik issued a check payable to Washington Mutual for an amount sufficient to satisfy the debt from the March 2005 Washington Mutual mortgage.  (Id. ¶ 26.)   However, instead of delivering the check to Washington Mutual, Ms. Torbik delivered it to Mr. Craven with the purported knowledge and intent that he would not deliver it to Washington Mutual.  (Id.  ¶¶ 28–29.)  Mr. Craven then fraudulently negotiated the check and deposited the funds to a bank account owned by his own company, Monument Mortgage.  (Id. ¶ 30.)  As a result of these actions, neither the Wachovia nor the Washington Mutual March 2005 mortgages were paid off.  (Id. ¶ 31–32.)  Both Ms. Torbik and Aimee Craven were aware of these mortgages at the time of the sale from Mr. Craven to Aimee.  (Id. ¶ 33–34.)

3

In connection with the October 2005 sale from Mr. Craven to his wife and the corresponding purchase money mortgage, Ms. Torbik and Whitford Land issued another Loan Policy of Title Insurance, which insured the purchase money mortgage as a first position mortgage lien against the Conshohocken Property.  (Id. ¶ 35.)  Despite committing Fidelity (via its agent, Whitford Land) to insure the October 2005 purchase money mortgage as a first position mortgage lien, however, Ms. Torbik recorded this mortgage as a *third* position mortgage lien behind the original Wachovia and Washington Mutual mortgages.  (Id. ¶ 36.)

Aimee Craven eventually defaulted on the loan secured by the 2005 purchase money mortgage.  (Id. ¶ 37.)  While preparing to initiate foreclosure, Washington Mutual obtained a title report indicating that both the Wachovia and original Washington Mutual mortgages remained of record.  (Id. ¶ 38.)  Mr. Craven defaulted on both of these mortgages.  (Id. ¶ 39.)  As a result of Mr. Craven's default on its loan, Wachovia secured a judgment in mortgage foreclosure against Mr. Craven and scheduled a Sheriff's sale of the property for June 23, 2010.  (Id. ¶ 40.)  In order to avoid a divestiture of both the March 2005 insured mortgage and the October 2005 insured mortgage, Fidelity paid off Mr. Craven's loan secured by the Wachovia mortgage.  (Id. ¶ 41.)

JPMorgan Chase Bank, N.A. ("Chase"), through the acquisition of certain assets of Washington Mutual, is now the holder of the March 2005 and October 2005 insured mortgages.  (Id. ¶ 42.)  Pursuant to its obligations under the October 2005 loan policy, Fidelity is tendering payments to Chase in satisfaction of the March 2005 mortgage.  (Id. ¶ 43.)

### 2.      922 Montgomery Avenue, Unit C-5, Bryn Mawr, PA

On March 9, 2004, Valerie Craven conveyed the real property at 922 Montgomery Avenue, Unit C-5, Bryn Mawr, PA ("The Bryn Mawr C-5 Property") to her father, Mr. Craven,

under a deed which was never recorded.  (Id. ¶ 44.)  On the same day, Mr. Craven also executed a mortgage against the Bryn Mawr C-5 Property in favor of Washington Mutual for $140,000.00. (Id. ¶ 45.)  On behalf of Fidelity, Whitford Land and Ms. Torbik issued a loan policy insuring this mortgage as a first position mortgage lien against the property.  (Id. ¶ 46.)  Ms. Torbik, however, failed to record the mortgage.  (Id. ¶ 47.)

On or about September 23, 2005, Mr. Craven sold the Bryn Mawr C-5 Property to his wife Aimee under a deed that was recorded on April 18, 2006.  (Id. ¶ 49.)  At this time, the insured C-5 mortgage was not paid off.  (Id.)  Subsequently, on July 24, 2006, Aimee Craven conveyed the Bryn Mawr C-5 Property to Vincent Varvolis, under a deed recorded on March 15, 2007.  (Id. ¶ 50.)  Mr. Varvolis also executed a mortgage against the property in the amount of $180,000.00, which was recorded on March 15, 2007.  (Id. ¶ 52.)  The original insured C-5 mortgage executed by Mr. Craven was still not paid off.  (Id. ¶ 51.)

Because neither the original insured C-5 mortgage nor the deed conveying the house from Valerie Craven to Vincent Craven was ever recorded, the insured C-5 mortgage was never perfected as a lien.  (Id. ¶ 47.)  Moreover, the insured C-5 mortgage did not attach to the property when it was conveyed from Mr. Craven to Mr. Varvolis.  (Id. ¶ 54.)  As a result, Plaintiff Fidelity paid Chase (the successor to Washington Mutual) for the insured C-5 mortgage.  (Id. ¶ 55.)

### 3.   922 Montgomery Avenue, Unit E-5, Bryn Mawr, PA

The facts for the real property at 922 Montgomery Avenue, Unit C-5, Bryn Mawr, PA ("The Bryn Mawr E-5 Property") are almost identical to those for the Bryn Mawr C-5 Property. On or about March 9, 2004, Valerie Craven conveyed the Bryn Mawr E-5 Property to her father, Mr. Craven, under a deed which was never recorded.  (Id. ¶ 56.)  On the same day, Mr. Craven

also executed a mortgage against the Bryn Mawr E-5 Property in favor of Washington Mutual for $138,000.00. (Id. ¶ 57.) On behalf of Fidelity, Whitford Land and Ms. Torbik issued a loan policy insuring this mortgage as a first position mortgage lien against the property. (Id. ¶ 58.) Ms. Torbik, however, failed to record the mortgage. (Id. ¶ 59.)

On July 19, 2006, Aimee Craven conveyed the Bryn Mawr E-5 Property to Mr. Varvolis, under a deed recorded on March 15, 2007. (Id. ¶ 61.) Mr. Varvolis also executed a mortgage against the property in the amount of $180,000.00, which was recorded on March 20, 2007. (Id. ¶ 63.) The original insured E-5 mortgage executed by Mr. Craven was still not paid off. (Id. ¶ 62.)

Because neither the original insured E-5 mortgage nor the deed conveying the house from Valerie Craven to Vincent Craven was ever recorded, the insured E-5 mortgage was never perfected as a lien. (Id. at ¶ 64.) Moreover, the insured E-5 mortgage did not attach to the property when it was conveyed to Mr. Varvolis. (Id. ¶ 65.) As a result, Plaintiff Fidelity paid Chase (the successor to Washington Mutual) for the insured E-5 mortgage. (Id. ¶¶ 66–67.)

### 4.     **Fidelity's Lawsuit**

Plaintiff Fidelity brought suit on July 30, 2012, alleging ten counts, including (1) fraud against Vincent Craven, Aimee Craven, and Monument Mortgage for failing to disclose to Fidelity the existence of the Wachovia mortgage and the numerous transfers and sales of the properties in question; (2) fraud against Vincent Craven, Aimee Craven, and Valerie Craven for directing Tammi Torbik to not record the various mortgages and for failing to inform Fidelity that the instruments were never recorded; (3) fraud against Tammi Torbik for failing to disclose the above information and for directing the Washington Mutual payoff check for the 2005 Conshohocken property mortgage to Mr. Craven; (4) negligence against Tammi Torbik; (5)

6

breach of fiduciary duty against Tammi Torbik; (6) breach of contract against Vincent Craven and Aimee Craven; (7) unjust enrichment against Vincent Craven, Aimee Craven, Valerie Craven, and Monument Mortgage; (8) conversion against Vincent Craven, Aimee Craven, Valerie Craven, and Monument Mortgage; (9) civil conspiracy against Vincent Craven, Aimee Craven, Valerie Craven, and Tammi Torbik; and (10) violations of the Racketeer Influence and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962 et. seq.

### B.   Torbik's Third-Party Complaint

Following the initiation of Fidelity's suit against her, Torbik filed a Third Party Complaint against her employers Third-party Defendants Bruce G. Taylor ("Taylor") and Whitford Land (collectively "Third-party Defendants").  According to that Third-party Complaint, from the late 1990s through 2008, Torbik was employed by and served as closing agent for Whitford Land. (Third-party Compl. ¶ 13.)  Torbik, in her capacity as Whitford Land's closing agent, performed only notary, fund disbursement, and other limited administrative services at real estate closings on Whitford Land's behalf, at all times subject to Whitford Land's and Taylor's control, supervision, and direction.  (Id. ¶ 14.)  At all relevant times, Whitford Land employed several individuals in addition to Taylor and Torbik, including, but not limited to non-parties Gwen Miller, Jacqui Dunn, Dennis Torbik, Carol Calsin, Dodie Milano, and Jennifer Fletcher.  (Id. ¶ 15.)  These other Whitford Land employees were given specific job responsibilities that Torbik was not assigned, such as conducting title searches, preparing commitments to insure title, preparing loan policies of title insurance, and recording deeds, mortgages, and other transactional documents on behalf of borrowers, lenders, and others.  (Id. ¶ 16.)

The Third-party Complaint alleges that Fidelity's and Whitford Land's principal-agent

relationship is governed by the Issuing Agency Agreement, dated October 7, 1992 (the "Agency Agreement"), which was signed on behalf of Whitford Land by Taylor in his capacity as president. (Id. ¶¶ 16–17.) Pursuant to the Agency Agreement, Fidelity allegedly agreed that Whitford Land would be solely liable for the entire amount of any loss incurred by Fidelity as a result of, among other things, issuance of title insurance policies with errors or omissions, which should have been known to Whitford Land, as well as "[f]raud, dishonesty, or defalcation committed by [Whitford Land], or its employee(s), officer(s), director(s), or agent(s)." (Id. ¶ 21.)

Fidelity alleged that Torbik was responsible for its losses. (Id. ¶ 25.) In response, Torbik asserts that to the extent she committed any act or omission causing such losses, she did so within the scope of her employment and at the direction of Taylor and/or Whitford Land. (Id. ¶ 26.) She further avers that Taylor, Whitford Land, and/or the other Whitford Land employees were responsible for all of the events leading to Fidelity's losses, as set forth in the Amended Complaint. (Id. ¶¶ 27–38.) More specifically, she contends that Third-party Defendants and/or other Whitford Land employees were responsible for (a) Whitford Land's issuance of the March 2005 Loan Policy despite knowledge of the prior mortgage lien; (b) failing to deliver the payoff check at the October 2005 closing; (c) Whitford Land's commitment to insure the October 2005 Insured Mortgage despite knowing of the existence of a prior lien; and (d) the failure to record the Insured C-5 Mortgage and the Insured E-5 Mortgage. (Id. ¶¶ 27, 29, 32, 35, 38.) Ultimately, Torbik avers that the acts and/or omissions of Taylor, Whitford Land, and/or Whitford Land's other employees were fraudulent with respect to Fidelity and Washington Mutual, constitute breaches of Whitford Land's Agency Agreement with Fidelity, constitute breaches of Whitford Land's fiduciary duty to Fidelity, were acts/omissions of negligence, and directly caused Fidelity's

alleged damages.  (<u>Id.</u> ¶¶ 39–43.)

Torbik's Third-party Complaint then goes on to assert that Taylor and Whitford Land wrongfully forfeited Torbik's liability insurance coverage.  Specifically, Torbik asserts that at all times during her tenure as a Whitford Land employee, Torbik performed professional services for others in connection with Whitford Land's real estate title and settlement business.  (<u>Id.</u> ¶ 44.) After receiving Plaintiff Fidelity's Complaint on August 13, 2012, Torbik's counsel contacted Whitford Land and instructed Whitford Land to notify Whitford Land's current professional liability insurer of Fidelity's claims against Torbik.  (<u>Id.</u> ¶¶ 47, 49.)  On October 19, 2012, Torbik's counsel received a letter from American Safety Indemnity Co. ("American Safety") denying coverage.  (<u>Id.</u> ¶ 51.)  Although it conceded that Torbik was an insured under the policy, American Safety denied coverage primarily because its policy purported to exclude from coverage any claim pending against an insured when the policy period began.  (<u>Id.</u> ¶ 53.)  According to American Safety, Torbik was without coverage because Fidelity's claims were pending against her prior to September 7, 2012, when the policy period began.  (<u>Id.</u> ¶¶ 52, 53.)  Torbik's counsel learned that Whitford Land's prior insurer was National Union Fire Insurance Company of Pittsburgh, PA ("AIG") and, upon contacting AIG, counsel received a letter denying coverage because Torbik's February 1, 2013 notice came after the end of the policy period and the sixty-day extended reporting period.  (<u>Id.</u> ¶¶ 56–60.)  AIG also denied coverage based on policy exclusions supposedly triggered by the allegations against Torbik.  (<u>Id.</u> ¶ 61.)

The Third-party Complaint sets forth five causes of action against the Third-party Defendants: (1) indemnity; (2) contribution; (3) negligence; (4) promissory estoppel; and (5) intentional interference with contractual relations.

C.    **Procedural History**

The Third-party Defendants filed a Motion for Summary Judgment on the Third-Party Complaint on April 17, 2015.  Torbik responded, seeking additional time to take uncompleted depositions prior to engaging in summary judgment practice.  By Order dated June 1, 2015, the Court extended the discovery period to June 12, 2015 and indicated that Third-party Defendants could renew their summary judgment motion no earlier than June 19, 2015 and no later than July 3, 2015.

In the meantime, on May 7, 2015, Torbik reached a settlement with Whitford Land's errors and omissions carrier, whereby Torbik agreed to terminate her lawsuit seeking defense and indemnity coverage from AIG in consideration of a lump sum payment of $35,000.00.  (Torbik's Resp. Opp'n Summ. J., Ex. A.)  On May 27, 2015, Torbik also reached a settlement with Plaintiff Fidelity, wherein Fidelity agreed to release its claims against Torbik in consideration of a payment of $10,000.  (Id., Ex. B.)  Subsequently, on June 30, 2015, Fidelity filed a Notice of Voluntary Dismissal dismissing all remaining claims against Torbik.

On July 3, 2015, Third-party Defendants renewed their summary judgment motion and, in response, Torbik again argued that the Motion was premature because neither the Cravens nor Bruce Taylor had been deposed.  With some hesitation, but out of an abundance of caution, the Court denied the motion without prejudice to allow Torbik to complete the requested depositions. In the meantime, on October 8, 2015, Plaintiff Fidelity filed a Stipulation of Dismissal dismissing its claims against all parties to the litigation, with each party bearing its own fees and costs.  That Stipulation was entered by the Court on October 13, 2015.

Thereafter, on October 27, 2015, Third-party Defendants filed the current Motion for

Summary Judgment.  Torbik responded on November 10, 2015, and Third-party Defendants filed a Reply on November 13, 2015.  The Motion is now ripe for judicial consideration.

## II.    STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing

11

out . . . that there is an absence of evidence to support the nonmoving party's claims."  <u>Id.</u> at 325.

If the non-moving party "fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden at trial,"

summary judgment is appropriate.  <u>Celotex</u>, 477 U.S. at 322.  Moreover, the mere existence of

some evidence in support of the non-movant will not be adequate to support a denial of a motion

for summary judgment; there must be enough evidence to enable a jury to reasonably find for the

non-movant on that issue.  <u>Anderson</u>, 477 U.S. at 249–50.

## III.    LEGAL DISCUSSION

Third-party Defendants now seek summary judgment on the entirety of Torbik's Third-

party Complaint.  The Court considers each of their arguments individually.

### A.    <u>Claims for Indemnity (Count I) and Contribution (Count II)</u>

Third-party Defendants first allege that Torbik's claims of indemnity and contribution

must fail.  In her Response, Torbik states that she "is willing to voluntarily dismiss her causes of

action for indemnity and contribution."  (Torbik's Resp. Opp'n Summ. J. 12.)  Given that

concession, the Court dismisses Counts I and II of the Third-party Complaint with prejudice.

### B.    <u>Negligence Claim (Count III)</u>

Count III of the Third-party Complaint asserts a claim of common law negligence against

Third-party Defendants, stating that Whitford Land owed Torbik "a duty to exercise reasonable

care in the procurement, maintenance, and administration of professional liability insurance

policies that cover her for third-party claims arising from acts and/or omissions alleged to have

occurred during her tenure as a Whitford Land employee."  (Third-party Complaint ¶ 70.)

According to Torbik, "Whitford and Taylor breached this duty by failing to notify AIG of

Fidelity's claims against Torbik, and by failing to disclose AIG's identity to Torbik or her counsel so they could notify AIG of Fidelity's claims against Torbik, before the end of any applicable reporting period or before any other deadline applicable to such notification to AIG."  (Id. ¶ 71.)

Third-party Defendants now contend that this claim fails both because (a) they had no duty to provide and facilitate insurance coverage for Torbik; and (b) a claim for negligence is barred by the economic loss doctrine.  The Court need not reach the second argument as Torbik has failed to identify any source of law obligating an employer to provide and maintain errors and omissions insurance for its employees.

To prevail on a cause of action in negligence under Pennsylvania law, a plaintiff must establish: (1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of another.  Morena v. South Hills Health Sys., 462 A.2d 680, 684 n.5 (Pa. 1983). "Whether a duty exists under a particular set of facts is a question of law."  Herczeg v. Hampton Twp. Mun. Auth., 766 A.2d 866, 871 (Pa. Super. Ct. 2001); Rossi v. Schlarbaum, 600 F. Supp. 2d 650, 657 (E.D. Pa. 2009).  Factors to be weighed in determining the existence of a duty include: "(1) the relationship between the parties; (2) the social value of the actor's conduct; (3) the nature of the risk imposed and the forseeability of the harm incurred; (4) the consequences of imposing a duty; and (5) the overall public interest in the proposed solution."  Althaus ex rel. Althaus v. Cohen, 756 A.2d 1166, 1169 (Pa. 2000).

In an effort to impose a duty in this case, Torbik cites to 40 P.S. § 910-26.1 as requiring Third-party Defendants to obtain errors and omissions insurance on her behalf.  (Torbik's Resp.

Opp'n Summ. J. 20.)  Contrary to Torbik's contention, however, this statute only provides that:

> Agents for a title insurance company shall be required to:
>
> (1) Obtain errors and omissions insurance in an amount acceptable to the insurer appointing the agent, but in no event in an amount less than two hundred fifty thousand dollars ($250,000) per claim and an aggregate limit of five hundred thousand dollars ($500,000) with a deductible no greater than twenty-five thousand dollars ($25,000). A title insurer shall not provide the insurance directly or indirectly on behalf of a title insurance agent. In the event errors and omissions insurance is unavailable generally, the Insurance Department shall promulgate rules for alternative methods to comply with this paragraph.

40 P.S. § 910-26.1(1).  A plain language interpretation reveals that no duty to an employee of a title insurance company is created.  Rather, the statute simply requires that a title insurance agency obtain the errors and omissions coverage to protect the *title insurance carrier,* who issues the policy, against error or omissions of the title insurance agency.  Nothing in this provision suggests that employees of the title insurance agency are entitled to such coverage by their employer in order to protect them from liability relating to their own mistakes.

Alternatively, Torbik suggests that Third-part Defendants' duty to her is rooted in "amorphous public policy considerations."  (Torbik's Resp. Opp'n Summ. J. 14 (citing Althaus, 756 A.2d at 1169.)  She suggests that, under the circumstances of this case, an employer such as Whitford Land/Taylor had a duty to provide an employee such as Torbik with errors and omissions insurance because the relationship between the parties left Torbik at her employer's mercy to maintain such insurance, and the risk of loss to her was foreseeable.

In making this argument, however, Torbik identifies no basis in either statute or common law that would impose a duty on Third-party Defendants to obtain insurance coverage to protect its employees against errors and omissions in the employees' work on behalf of the company.

14

Likewise, this Court's own review of the applicable jurisprudence unveils no cases wherein such a duty was imposed.  Finally, the Court finds nothing in the particular relationship between the parties, the social value of Torbik's or Third-party Defendants' conduct, the type of risk and the forseeability of harm, or the overall public interest that would suggest that this Court should create such a duty.  Indeed, extending Torbik's argument to its extreme would impose a duty on all employers—regardless of the nature of the business—to obtain errors and omissions coverage for the benefit of their employees.

In short, the Court simply cannot find that Third-party Defendants bore any duty to Torbik to obtain insurance coverage on her behalf.  Absent such a duty, Torbik's negligence claim must fail.

### C.   Promissory Estoppel Claim (Count IV)

The elements of promissory estoppel reliance are: "(1) a promise to a promisee, (2) which the promisor should reasonably expect will induce action by the promisee, (3) which does induce action, and (4) which should be enforced to prevent injustice to the promisee." C & K Petroleum Prods., Inc. v. Equibank, 839 F.2d 188, 192 (3d Cir. 1988); KSM Assoc., Inc. v. ACS State Healthcare, LLC, No. Civ.A.05-4118, 2006 WL 1308267, at *2 (E.D. Pa. May 10, 2006).  The first essential element of promissory estoppel requires an express promise between the promisor and promisee.  A "broad or vague implied promise" will not suffice.  C & K Petroleum Prods., Inc., 839 F.2d at 192 (implied promise by bank to "administer the main checking account . . .  in the normal, banking fashion" too vague for promissory estoppel claim).  Even an express promise must indicate with "reasonable certainty" the intent of the parties.  Ankerstjerne v. Schlumberger Ltd., No. Civ.A.03-3607, 2004 WL 1068806, at *5 (E.D. Pa. May 12, 2004), aff'd, 155 F. App'x

48 (3d Cir. Sept. 1, 2005). Under the doctrine of promissory estoppel, the party seeking to impose

the estoppel bears the burden of establishing these elements.  Thatcher's Drug Store of W. Goshen

v. Consol. Supermkts., Inc., 636 A.2d 156, 535 Pa. 469, 477 (Pa. 1994).

 In the present case, the first element of a promissory estoppel claim is utterly lacking.

Torbik does not identify any explicit promise by Third-party Defendants to obtain and maintain

errors and omissions coverage on her behalf.  To compensate for the absence of such an explicit

representation, she contends that representations may be in the form of "conduct or silence" by the

party against whom estoppel is asserted.  (Torbik's Resp. Opp'n Summ. J. 17 (quoting  Thomas v.

E.B. Jermyn Lodge No. 2, 693 A.2d 974, 978 (Pa. Super. Ct. 1997)).  She suggests that she knew

that Third-party Defendants maintained an errors and omissions policy, but they never told her

that this policy would not apply to her.

 Mere silence, however, is insufficient; rather it is "misleading" silence inducing another to

act that must be alleged.  Thomas, 693 A.2d at 977 (indicating that promissory estoppel requires

"[m]isleading words, conduct, or silence").  For example, had Torbik told Third-party Defendants

that she understood that she was covered under an errors and omissions policy, and had Third-

party Defendants stayed silent in the face of such a statement, Torbik may have had a plausible

claim of misleading silence.  Notably, however, at her deposition, Torbik affirmatively stated that

there were no discussions regarding her coverage under Whitford Land's errors and omissions

policy:

> Q. When you were at Whitford, did you have any discussions with Bruce Taylor
> about errors and omissions insurance?
> A. No.
> Q. You never discussed it with him at all?
> A. At some point, I think they [Whitford] had a certain number of claims and they

had to find someone else or that the rate was going way up.  I kind of recall a discussion about that.  I don't know if it was directly between us two or if I heard—overheard him and Gwen discussing it.

Q.    When you were at Whitford, did you have any discussion with Bruce Taylor about the applicability of Whitford's errors and omissions insurance to you?

A.    No.

Q.    You never had any discussions with him about that at all?

A.    No.

Q.    When you were at Whitford, did you have any expectation as to whether Whitford's errors and omissions coverage would cover you in any circumstance?

A.    I never really thought about it.

Q.    Mr. Taylor never made any statements to you one way or the other about that?

A.    No.

Q.    Mr. Taylor never expressly promised you that the company's errors and omissions coverage would apply to things that you did?

A.    No.  As I said, it was never discussed.

(Torbik's Resp. Opp'n Summ. J., Ex. A, Dep. of Tammi M. Torbik ("Torbik Dep."),

299:24–301:12, Jan. 12 & 23, 2015.)

Q.    . . . When you were at Whitford, did you have any discussion with Bruce Taylor about [errors and omissions coverage if she was sued for something she did at her job].

A.    I had no reason to.

Q.    So Bruce Taylor didn't make any representations to you about the extent of coverage of—of the errors and omissions insurance?

A.    As I said, we never discussed it, so . . .

Q.    Okay.  So,—so you're agreeing with me, he didn't make any representations about that—

A.    No.

Q.    —one way or the other.

A.    One way or the other.

Q.    Right.

A.    Right.

(Id. at 306:15–307:8.)  Given the complete absence of any discussion of this issue between Torbik

and Third-party Defendants, the Court cannot find that Third-party Defendants' failure to

explicitly tell Torbik that she was *not* covered by certain insurance policies rose to the level of a

promise on which Torbik could justifiably rely.

In an alternative tactic, Torbik relies on Third-party Defendants' course of conduct to establish a promise.  Specifically, she asserts that she knew Whitford Land had errors and omissions coverage.  (Torbik Dep. 296:25–297:4.)  Moreover, the record shows the existence of a policy, written by AIG, that listed Whitford Land as named insured and provided that "You, your or insured" meant "any past, present or future officer, director, trustee or employee of the named insured or subsidiary thereof . . . ."  (Torbik's Resp. Opp'n Summ. J., Ex. N.)  Torbik was able to identify the errors and omissions agent and indicated that she knew how to find him if there was an errors and omissions question, although that was not something she would normally do.  (Torbik Dep. 297:6–298:11.)  Although she remarked that there were claims against Whitford Land "all the time," she was not aware of any other situation where another employee was individually sued.  (Id. at 187:21–22, 305:23–25.)  She noted that, in her view, if another employee had been sued there, they would have been covered, so the fact that she was sued for something she did as an employee should have been covered by the errors and omissions insurance.  (Id. at 305:19–306:4.)

Again, however, Torbik's unfounded beliefs cannot give rise to a promissory estoppel claim.  By Torbik's various admissions, there was no course of conduct at Whitford Land that would lead her to believe that if she were sued for activities done in the scope of her employment, she would be covered by the errors and omissions insurance.  First, although she indicated that she was aware of several other claims against Whitford Land during her tenure, she never stated any belief as to whether such claims were covered by errors and omissions insurance as opposed to

Whitford Land itself.[1]  Moreover, she admitted that she was never aware of another employee getting sued individually and, thus, had no basis to believe that if an employee were sued, they would be covered.  Finally, Torbik conceded that she never even thought about whether Whitford Land's errors and omissions coverage would cover her in any circumstance, and it was something that was just never discussed.  (Id. at 300:21–301:12.)  Accordingly, Torbik's contention that the agreement to provide errors and omissions insurance was implied by the course of dealings between the parties is flatly undermined by the record before the Court.

Lastly, as with her negligence claim, Torbik asserts that the duty to provide errors and omissions coverage was required by state law, again citing to 40 P.S. 910-26.1, and was required by Fidelity.  As such, she relied on Whitford Land's duty to maintain such coverage.  As noted above, however, that statute only required Whitford Land to maintain such insurance for the benefit of their clients, which they did.  Nothing in the statute required that the insurance be maintained for the benefit of the employees or to cover actions by employees that were believed to be intentional or fraudulent.

Promissory estoppel occurs when the promisor made a promise that he should have "reasonably expected" to induce action or forbearance on the promisee.  Crouse v. Cyclops Indus., 745 A.2d 606, 610 (Pa. 2000).  In this case, however, the record is devoid of evidence reflecting

---

[1]  Notably, Taylor testified in his deposition about the fact that the errors and omissions insurance covered some of claims brought against Whitford Land.  He also explained his belief that the errors and omissions insurance would cover an employee's error "[i]f within the normal course of business it was an honest error, no fraud, no other stuff going on, no ulterior motives, no drugs, no alcohol, no money issues, none of those things were involved."  (Pl.'s Resp. Opp'n Summ. J., Ex. B, Dep. of Bruce Taylor ("Taylor Dep."), 35:10-36:12, Oct. 14, 2015.)  These facts, however, have no bearing on whether any representation—either express or implied—was ever made to Torbik regarding whether she would be covered.  As noted above, by her own admission, she knew nothing about coverage.

any promise—whether explicitly made or implied by a course of conduct or misleading

silence—upon which Torbik could have reasonably relied.  Rather, any purported promise of

errors and omissions coverage by Third-party Defendants Torbik arose solely from Torbik's own

speculative and unfounded belief that if such insurance was maintained by the company, it must

cover her.  "Promissory estoppel would be rendered meaningless if this Court were to allow

[Torbik] to maintain an action for detrimental reliance based on the alleged existence of such a

broad and vague implied promise."  C&K Petroleum Prods., 839 F.2d 188, 192 (3d Cir. 1988)  "A

claim for estoppel cannot survive when the plaintiff's actions were based on 'his own will and

judgment' rather than the defendant's representations."  Luther v. Kia Motors Am., Inc., 676 F.

Supp. 2d 408, 422 (W.D. 2009) (quotations omitted).  Therefore, the Court grants Third-party

Defendants' Motion for Summary Judgment on this claim.

### D.    Tortious Interference With Contract

Torbik's last remaining cause of action alleges a claim for tortious interference with

contractual relations.  Specifically, the Third-party Complaint asserts:

> 78.    There exists a contractual relation between Torbik and AIG, in the form of the professional liability insurance policy described by AIG in Exhibit I attached hereto, which (subject to various exclusions and reporting requirements) covers Torbik for professional liability claims made and reported during the policy period September 7, 2011, to September 7, 2012, and includes a sixty-day automatic reporting period. . . .

> 79.    Taylor and Whitford purposefully acted to interfere with Torbik's contractual relation with AIG and specifically intended to harm such relation by wrongfully withholding AIG's identity from Torbik during the period commencing on the date Whitford received undersigned counsel's September 27, 2012 letter . . . through February 7, 2013, when Whitford's counsel acknowledged AIG's identity.

> 80.    Taylor and Whitford purposefully acted to interfere with Torbik's contractual

20

relation with AIG and specifically intended to harm such relation by wrongfully communicating to AIG that Torbik was not working in her capacity as a Whitford employee when the transactions and occurrences alleged in Fidelity's complaint occurred, which legal conclusion is patently inconsistent with Pennsylvania law.  See Traveler's Casualty & Surety Co. v. Castegnaro, 772 A.2d 456 (Pa. 2001) (citing Aiello v. Ed Saxe Real Estate, Inc., 499 A.2d 282, 285 (Pa. 1985)).

81.   Taylor and Whitford purposefully acted to interfere with Torbik's contractual relation with AIG and specifically intended to harm such relation by wrongfully threatening Torbik and undersigned counsel in the February 7, 2013, letter . . . which threat was specifically intended to intimidate Torbik and prevent her from realizing the benefits of her contractual relation with AIG.

82.   There exists no privilege or justification cognizable at law or in equity for Taylor's or Whitford's intentional interference with Torbik's contractual relations with AIG.

83.   Had Taylor and Whitford not intentionally interfered as alleged herein, there was a reasonable likelihood or probability that Torbik would have realized the benefits of her contractual relation with AIG.

84.   As a result of Whitford's and Taylor's intentional interference, AIG has refused to defend, indemnify, or otherwise cover Torbik and Torbik has suffered and will suffer damages in the form of (a) attorney fees, costs, and expenses Torbik has incurred and will continue to incur in connection with defending Fidelity's claims against her, the exact amount of which is unknown at this time . . .; and (b) any judgment that may be entered against her in this action.

(Third-party Compl. ¶¶ 78–84.)  Third-party Defendants now contend that this cause of action

must fail.

Pennsylvania has adopted section 766 of the Restatement (Second) of Torts which sets out

the tort of intentional interference with an existing contract.  Adler, Barish, Daniels, Levin &

Creskoff v. Epstein, 393 A.2d 1175, 1183 (Pa. 1978).  Section 766 provides that:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or

> otherwise causing the third person not to perform the contract, is subject to liability
> to the other for the pecuniary loss resulting to the other from the third person's failure
> to perform the contract.

Restatement (Second) of Torts § 766.  It is well established under Pennsylvania law that a tortious

interference claim cannot lie against the party to the contract in question because that party cannot

also be a third-party interloper.  Surya Sys., Inc. v. Sunku, No. Civ.A.05-146, 2005 WL 1514225,

at *3 (E.D. Pa. June 24, 2005); see also Ctr. for Concept Dev., Ltd. v. Godfrey, No.

Civ.A.97-7910, 1999 WL 163006, at *3 (E.D. Pa. March 23, 1999) (citing as "hornbook law" the

established principle that a party to a contract cannot tortiously interfere with its own contract);

Fishkin v. Susquehanna Partners, G.P., 563 F. Supp. 2d 547, 587 (E.D. Pa. 2008) ("Because a

company like TABFG can only act through its employees or managers, the claim that TABFG

induced Fishkin and Chernomzav to breach their contracts is essentially that Fishkin and

Chernomzav, acting through TABFG, induced themselves into breach.  Imposing liability under

such a theory is problematic because it is not clear that the defendant corporation can be said to

have induced a breach by a third party under these circumstances.").

In the present case, it is undisputed the contract at issue is Whitford Land's insurance

contract with AIG, under which Torbik, as employee, was named as a potential insured.  Torbik

never actually entered into any contract with AIG and, indeed, admitted that she did not have any

insurance policy with AIG.  (Torbik Dep. 301:13–18.)  Under well-established legal principles,

Third-party Defendants could not possibly commit tortious interference with their own contract

against an individual who is not a party to the contract.  As such, this claim must be dismissed.

In an effort to avoid this outcome, Torbik argues that Pennsylvania has not adopted the

"stranger rule," meaning that Whitford Land did not need to be a stranger to the contract in order

to tortiously interfere with it.  (Torbik's Resp. Opp'n Summ. J. 3 (citing Velocity Int'l, Inc. v. Celebrity Healthcare Solutions, Inc., 846 F. Supp. 2d 332 (W.D. Pa. 2011); Kernaghan v. BCI Commc'ns, Inc., 802 F. Supp. 2d 590 (E.D. Pa. 2011).)  This argument misunderstands the "stranger rule."  In states which apply the "stranger rule," a plaintiff must establish that the defendant was a "stranger" to the protected business relationship with which it allegedly interfered.  Edwards v. Prime, Inc., 602 F.3d 1276, 1302 (11th Cir. 2010).  "A defendant is a party in interest to a business or contractual relationship if the defendant has any beneficial or economic interest in, or control over, that relationship. . . . When the defendant is an essential party to the allegedly injured business relationship, the defendant is a participant in that relationship instead of a stranger to it."  Id. (quotations omitted).  In other words, the "stranger rule" means that a defendant against whom a tortious interference claim is alleged must not only not be a party to the contract, but must also have no economic benefit or interest in the *relationship* formed by the contract.  As recognized by the cases cited by Torbik, however, Pennsylvania's refusal to adopt the "stranger rule" does not impact the well-established principle that "[u]nder Pennsylvania law, a claim for tortious interference will survive only if a defendant is *not a party to the contract* alleged to have been tortiously interfered with."  Kernaghan, 802 F. Supp. 2d at 597 (emphasis added) (citing Daniel Adams Assocs., Inc. v. Rimbach Publ'g, 519 A.2d 997, 1000–02 (Pa. Super. 1987)).

In addition, Torbik argues that she has not sued an officer, manager or shareholder of AIG for interfering with her rights under the policy, but rather has sued Taylor and Whitford Land for interfering with her rights under that policy.  She contends that the mere fact that Taylor and Whitford Land are insureds under the policy is irrelevant; for purposes of this action, they are

"third persons," who interfered with her attempts to secure coverage.  Again, however, this

argument is entirely misplaced.  Had Torbik maintained her own policy with AIG, with which

Third-party Defendants interfered, she would have a cognizable claim against them for tortious

interference.  That, however, is not the case.  Rather, the contract at issue is between Third-party

Defendants and AIG—a contract of which Torbik was a purported beneficiary.  Given

Pennsylvania's unequivocal adoption of § 766 of the Restatement—which specifically indicates

that a party cannot tortiously interfere with its own contracts—Torbik's claim against Third-party

Defendants must fail.[2]

In short, Torbik has failed to show a remaining genuine issue of material fact that would

preclude the entry of summary judgment in favor of Third-party Defendants on the tortious

interference with contract claim.  Accordingly, Third-party Defendants' Motion on this claim is

granted.

---

[2]  Alternatively, even if the Court were to find that Torbik could proceed on her tortious interference claim, the majority of that claim would fail for other reasons.  As set forth above, the Third-party Complaint states that Taylor and Whitford Land (1) withheld AIG's identity from Torbik from September 27, 2012 to February 7, 2013; (2) wrongfully communicated to AIG that Torbik was not working in her capacity as a Whitford Land employee when the transactions in Fidelity's complaint occurred; and (3) Taylor and Whitford Land wrongfully threatened Torbik and her counsel in an effort to intimidate Torbik and prevent her from realizing the benefits of her contract with AIG.  (Third-party Compl. ¶¶ 79–81.)  The first and third allegations cannot support a claim of tortious interference.  Section 766 of the Restatement indicates that a claim for tortious interference lies where a defendant improperly interferes with the performance of a contract "by inducing or otherwise causing the third person not to perform the contract."  Rest. (Second) of Torts § 766.  The first and third allegations, however, describe Third-party Defendants' actions directed at Torbik, not AIG.  As neither allegation reflects any inducement of AIG not to perform, no tortious interference claim can lie.

As to Torbik's remaining allegation, the Court need not consider the validity of that assertion in light of the aforementioned finding that Third-party Defendants cannot be liable for interference with their own contract.

24

**IV.     CONCLUSION**

Having thoroughly considered the parties' briefs and attached exhibits, the Court cannot find that any of the claims in Torbik's Third-party Complaint survive.  As noted above, Torbik voluntarily dismisses her claims for indemnity and contribution (Counts I and II).  Further, Torbik's negligence claim must fail because she has not established any duty on the part of Third-party Defendants to provide her with errors and omissions insurance.  Moreover, Torbik's promissory estoppel claim cannot survive given the absence of any promise by Third-party Defendants to Torbik on which she justifiably relied.  Finally, summary judgment is warranted in favor of Third-party Defendants on Torbik's claim for tortious interference with contract since the contract at issue is the insurance policy between Third-party Defendants and AIG, and, under Pennsylvania law, a defendant cannot tortiously interfere with its own contract.[3]  Therefore, the Court grants Third-party Defendants' Motion in its entirety and enters summary judgment in favor of Third-party Defendants on the Third-party Complaint.

An appropriate Order follows.

---

[3]  Notably, Third-party Defendants make the final argument that regardless of whether Torbik has viable claims against Whitford Land, all of her claims against Taylor in his individual capacity must be dismissed because he personally owed no duties to Torbik at all.  Given the Court's dismissal of all of Torbik's claims, however, this argument need not be separately addressed.

25